# Exhibit 10

Case 1:05-cv-01882-RCL   Document 12-13   Filed 06/30/2006   Page 1 of 5

ducers, Inc., Akron Milk Producers, Inc., Stark County Cooperative Sales Association, Northwestern Cooperative Sales Association, Constantine Cooperative Creamery Company, and Tri-County Producers Cooperative have requested that the eligible-ineligible plan of the order be terminated at the earliest possible date in order that producers may be aware that their milk deliveries during the months of October through December 1960 will not be used as a basis of computing payments during the months of April through June 1961. Termination of the plan will have no effect on costs of milk to handlers, but will affect distribution of returns among producers with different seasonal patterns of production. Timely action on the request can best be accomplished through termination of the provisions cited. Opportunity is hereby afforded all interested parties to submit written data, views and arguments with respect to the proposed termination.

All persons who desire to submit written data, views, or arguments in connection with the proposed termination should file the same with the Hearing Clerk, Room 112, Administration Building, United States Department of Agriculture, Washington 25, D.C., not later than 10 days from the date of publication of this notice in the FEDERAL REGISTER. All documents filed should be in quadruplicate.

Issued at Washington, D.C., this 19th day of July 1960.

CLARENCE L. MILLER,
Assistant Secretary.

[F.R. Doc. 60-6878; Filed, July 21, 1960; 8:50 a.m.]

# DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

Food and Drug Administration

[ 21 CFR Parts 1, 130 ]

ENFORCEMENT REGULATIONS DRUGS AND DEVICES, NEW DRUGS

Notice of Proposal to Amend Labeling Requirements

The Commissioner of Food and Drugs, pursuant to the provisions of the Federal Food, Drug, and Cosmetic Act (sec. 701 (a), 52 Stat. 1055; 21 U.S.C. 371(a)) and under the authority delegated to him by the Secretary of Health, Education, and Welfare (22 F.R. 1045, 23 F.R. 9500, 25 F.R. 5611) proposes to amend the regulations for the enforcement of the drug and device sections and the new-drug section (21 CFR 1.106, 130.4, 130.5, 130.9, 130.13) as hereinafter set forth. The Commissioner hereby offers an opportunity to all interested persons to submit their views in writing with reference to this proposal to the Hearing Clerk, Department of Health, Education, and Welfare, Room 5440, 330 Independence Avenue SW., Washington 25, D.C., within 60 days from the date of publication of this notice in the FEDERAL REGISTER. Views and comments should be submitted in quintuplicate.

1. It is proposed to amend § 1.106 in the following respects:

a. By changing paragraphs (b), (c), and (d) to read as follows:

§ 1.106　Drugs and devices; directions for use.

* * * * *

(b) *Exemption for prescription drugs.* A drug subject to the requirements of section 503(b)(1) of the act shall be exempt from section 502(f)(1) if all the following conditions are met:

(1) The drug is:

(i)(a) In the possession of a person (or his agents or employees) regularly and lawfully engaged in the manufacture, transportation, storage, or wholesale distribution of prescription drugs; or

(b) In the possession of a retail, hospital, or clinic pharmacy, or a public health agency, regularly and lawfully engaged in dispensing prescription drugs; or

(c) In the possession of a practitioner licensed by law to administer or prescribe such drugs; and

(ii) It is to be dispensed in accordance with section 503(b).

(2) The label of the drug bears:

(i) The statement "Caution: Federal law prohibits dispensing without prescription"; and

(ii) The recommended or usual dosage; and

(iii) The route of administration, if it is not for oral use; and

(iv) If it is fabricated from two or more ingredients and is not designated solely by a name recognized in an official compendium, the quantity or proportion of each active ingredient, as well as the information required by section 502 (d) and (e); and

(v) If it is intended for ophthalmic use or for administration by parenteral injection, the quantity or proportion of all inactive ingredients; and

(vi) An identifying lot or control number from which it is possible to determine the complete manufacturing history of the package of the drug;

*Provided, however,* That in the case of containers too small or otherwise unable to accommodate a label with sufficient space to bear all such information, but which are packaged within an outer container from which they are removed for dispensing or use, the information required by subdivisions (ii), (iii) and (v) of this subparagraph may be contained in other labeling on or within the package from which it is to be dispensed, and the information referred to in subdivision (i) of this subparagraph may be placed on such outer container only.

(3) Labeling on or within the package from which the drug is to be dispensed bears adequate information for its use, including indications, effects, dosages, routes, methods, and frequency and duration of administration, and any relevant hazards, contraindications, side effects, and precautions under which practitioners licensed by law to administer the drug can use the drug safely and for the purposes for which it is intended, including all purposes for which it is advertised or represented; and, if the article is subject to section 505, 506, or 507 of the act, the labeling bearing such information is the labeling authorized by the effective new-drug application or required as a condition for the certification or the exemption from certification requirements applicable to preparations of insulin or antibiotic drugs: *Provided, however,* That in the case of drugs not subject to section 505, 506, or 507, such information may be omitted from the dispensing package if, but only if, the article is a drug for which directions, hazards, warnings, and use information are commonly known to the ordinary practitioner. Upon written request, stating reasonable grounds therefor, the Commissioner will offer an opinion on a proposal to omit such information from the dispensing package under this proviso.

(4) Any labeling, whether or not it is on or within a package from which the drug is to be dispensed, distributed by or on behalf of the manufacturer, packer, or distributor of the drug, that furnishes or purports to furnish information for use or which prescribes, recommends, or suggests a dosage for the use of the drug contains:

(i) Adequate information for its use, including indications, effects, dosages, routes, methods, and frequency and duration of administration and any relevant hazards, contraindications, side effects, and precautions, under which practitioners licensed by law to administer the drug can use the drug safely and for the purposes for which it is intended, including all conditions for which it is advertised or represented; and if the article is subject to section 505, 506, or 507 of the act, the labeling providing such information is the labeling authorized by the effective new-drug application or required as a condition for its certification or exemption from certification; and

(ii) The same information concerning the ingredients of the drug as appears on the label and labeling on or within the package from which the drug is to be dispensed.

(5) All labeling bearing information for use of the drug also bears the date of the issuance of such labeling.

(c) *Exemption for veterinary drugs.* A drug intended solely for veterinary use which, because of toxicity or other potentiality for harmful effect, or the method of its use, is not safe for animal use except under the supervision of a licensed veterinarian, and hence for which "adequate directions for use" cannot be prepared, shall be exempt from section 502(f)(1) of the act if all the following conditions are met:

(1) The drug is:

(i) In the possession of a person (or his agents or employees) regularly and lawfully engaged in the manufacture, transportation, storage, or wholesale or retail distribution of veterinary drugs and is to be sold only to or on the prescription or other order of a licensed veterinarian for use in the course of his professional practice; or

PROPOSED RULE MAKING

(ii) In the possession of a licensed veterinarian for use in the course of his professional practice.

(2) The label of the drug bears:

(i) The statement "Caution: Federal law restricts this drug to sale by or on the order of a licensed veterinarian"; and

(ii) The recommended or usual dosage; and

(iii) The route of administration, if it is not for oral use; and

(iv) If it is fabricated from two or more ingredients and is not designated solely by a name recognized in an official compendium, the quantity or proportion of each active ingredient as well as the information required by section 502(e) of the act; and

(v) If it is intended for ophthalmic use or for administration by parenteral injection, the quantity or proportion of all inactive ingredients; and

(vi) An identifying lot or control number from which it is possible to determine the complete manufacturing history of the package of the drug:

Provided, however, That in the case of containers too small or otherwise unable to accommodate a label with sufficient space to bear all such information, but which are packaged within an outer container from which they are removed for dispensing or use, the information required by subdivisions (ii), (iii), and (v) of this subparagraph may be contained in other labeling on or within the package from which it is to be so dispensed, and the information referred to in subdivision (i) of this subparagraph may be placed on such outer container only.

(3) Labeling on or within the package from which the drug is to be dispensed bears adequate information for its use, including indications, effects, dosages, routes, methods, and frequency and duration of administration, and any relevant hazards, contraindications, side effects, and precautions under which veterinarians licensed by law to administer the drug can use the drug safely and for the purposes for which it is intended, including all purposes for which it is advertised or represented; and if the article is subject to section 505, or 507 of the act, the labeling bearing such information is the labeling authorized by the effective new-drug application, or required as a condition for the certification or the exemption from certification requirements applicable to preparations of antibiotic drugs: Provided, however, That in the case of drugs not subject to sections 505 or 507, such information may be omitted from the dispensing package if, but only if, the article is a drug for which directions, hazards, warnings, and other information are commonly known to the ordinary veterinarian. Upon written request, stating reasonable grounds therefor, the Commissioner will offer an opinion on a proposal to omit such information from the dispensing package under this proviso.

(4) Any labeling, whether or not it is on or within a package from which the drug is to be dispensed, distributed by or on behalf of the manufacturer, packer, or distributor of the drug, that furnishes or purports to furnish information for use or which prescribes, recommends, or suggests a dosage for the use of the drug contains:

(i) Adequate information for its use, including indications, effects, dosages, routes, methods, and frequency and duration of administration, and any relevant hazards, contraindications, side effects, and precautions, under which veterinarians licensed by law to administer the drug can use the drug safely and for the purposes for which it is intended, including all conditions for which it is advertised or represented; and if the article is subject to section 505 or 507 of the act, the labeling providing such information is the labeling authorized by the effective new-drug application or required as a condition for its certification or exemption from certification; and

(ii) The same information concerning the ingredients of the drug as appears on the label and labeling on or within the package from which the drug is to be dispensed.

(5) All labeling bearing information for use of the drug also bears the date of the issuance of such labeling.

(d) Exemption for prescription devices. A device, which, because of any potentiality for harmful effect, or the method of its uses, or the collateral measures necessary to its use, is not safe except under the supervision of a practitioner licensed by law to direct the use of such device, and hence for which "adequate directions for use" cannot be prepared, shall be exempt from section 502(f)(1) of the act if all the following conditions are met:

(1) The device is:

(i)(a) In the possession of a person (or his agents or employees) regularly and lawfully engaged in the manufacture, transportation, storage, or wholesale or retail distribution of such device; or

(b) In the possession of a practitioner, such as physicians, dentists, and veterinarians, licensed by law to use or order the use of such device; and

(ii) Is to be sold only to or on the prescription or other order of such practitioner for use in the course of his professional practice.

(2) The label of the device (other than surgical instruments) bears:

(i) The statement "Caution: Federal law restricts this device to sale by or on the order of a _____" the blank to be filled with the word "physician," "dentist," "veterinarian," or with the descriptive designation of any other practitioner licensed by the laws of the State in which he practices, to use or order the use of the device; and

(ii) The method of its application or use.

(3) Labeling on or within the package from which the device is to be dispensed bears information for use, including indications, effects, routes, methods, and frequency and duration of administration, and any relevant hazards, contraindications, side effects, and precautions under which practitioners licensed by law to administer the device can use the device safely and for the purpose for which it is intended, including all purposes for which it is advertised or represented: Provided, however, That such information may be omitted from the dispensing package if, but only if, the article is a device for which directions, hazards, warnings, and other information are commonly known to the ordinary practitioner. Upon written request, stating reasonable grounds therefor, the Commissioner will offer an opinion on a proposal to omit such information from the dispensing package under this proviso.

(4) Any labeling, whether or not it is on or within a package from which the device is to be dispensed, distributed by or on behalf of the manufacturer, packer, or distributor of the device, that furnishes or purports to furnish information for use of the device contains adequate information for its use, including indications, effects, routes, methods, and frequency and duration of administration and any relevant hazards, contraindications, side effects, and precautions, under which practitioners licensed by law to employ the device can use the device safely and for the purposes for which it is intended, including all purposes for which it is advertised or represented.

(5) All labeling bearing information for use of the device also bears the date of the issuance of such labeling.

b. By revoking § 1.106(e).

2. It is proposed to amend § 130.4 Applications by changing items (6) (c), (d), (e) and (9) in the new-drug application form set out in paragraph (c) to read as set forth below and by adding to § 130.4 a new paragraph (e), reading as indicated:

§ 130.4 Applications.

* * * * *

(c) * * *

(6) * * *

(c) If the drug is limited in its labeling to use under the professional supervision of a practitioner licensed by law to administer it, labeling on or within the package from which the drug is to be dispensed should bear information for use under which such practitioners can use the drug for the purposes for which it is intended, including all the purposes for which it is to be advertised or represented.

(d) Typewritten or other draft labeling copy may be accepted for conditional consideration of an application with the understanding that final printed labeling identical in content to the draft copy will be submitted as soon as available and prior to the marketing of the drug.

* * * * *

(0) It is agreed that the labeling and advertising for the drug will prescribe, recommend, or suggest its use only under the conditions stated in the labeling which is part of this application; and if the article is a prescription drug, it is agreed that any labeling which furnishes or purports to furnish information for use or which prescribes, recommends, or suggests a dosage for use of the drug will also contain adequate information for its use, including indications, effects, dosages, routes, methods, and frequency and duration of administration, any relevant hazards, contraindications, side effects, and precautions, which is contained in the labeling on or within the package from which the drug is to be dispensed.

It is understood that all representations in this application regarding the components,

*Friday, July 22, 1960*  FEDERAL REGISTER  6987

composition, manufacturing methods, facilities, controls, and labeling apply to the drug produced until an effective supplement to the application provides for a change or the applicant is notified in writing by the Food and Drug Administration that a supplemental application is not required for the change, or the article is no longer a new drug. It is further understood that a new drug for which an application is conditionally effective may not be marketed until the stated conditions have been met, including when such is a condition, the submission of final printed labeling identical in content to the draft copy in the application, and including, when such is a condition, notification of the New Drug Branch when the first production batch of the drug will be prepared, so that an inspection may be conducted to verify the adequacy of the manufacturing methods, facilities, and controls.

(e) When in the judgment of the New Drug Branch, the description of the methods used in and the facilities and controls used for the manufacture, processing, and packaging of such drug appears adequate on its face, but it is not feasible to reach a conclusion as to the safety of the drug solely from consideration of this description, the New Drug Branch will notify the applicant that an inspection is required and the application will be made conditionally effective until such time that it is notified that the applicant is prepared to produce the first production batch, and the Administration is given an adequate opportunity to inspect the manufacturing methods, facilities, and controls to verify their adequacy. When an application is made conditionally effective under the conditions prescribed in this paragraph, the production and marketing of the drug without notification of the New Drug Branch or without offering an opportunity for an inspection to verify the adequacy of the manufacturing methods, facilities, and controls shall be regarded as the production and marketing of a drug for which no new-drug application is effective.

3. It is proposed to amend the first sentence of § 130.5(a)(3) to read as follows:

§ 130.5  Reasons for refusing to file applications.

(a) * * *

(3) The specimens of labeling proposed for use upon or within the retail package do not expressly prescribe, recommend, or suggest the use of such drug under such conditions. * * *

4. It is proposed to amend § 130.9 to read as follows:

§ 130.9  Supplemental applications.

(a) After an application is effective, a supplemental application may propose changes. The supplemental application may omit statements made in the effective application concerning which no change is proposed. A supplemental application should be submitted for any change beyond the variations provided for in the application, that may alter the conditions of use, the labeling, the safety, identity, strength, quality, or purity of the drug or the adequacy of manufacturing methods, facilities, or controls to preserve them. Labeling changes include deviations from the authorized brochure in any mailing or promotional piece used after the drug is placed on the market. When necessary for the safety of the drug, a supplemental application may be required to specify a period of time within which the proposed change will be made; and in such case the distribution of the drug after such time without such change constitutes distribution without an effective new-drug application. If a material change is made in labeling or advertising from the representations in an effective application for a new drug before a supplement is effective for such change, the application may be suspended under § 130.27, because the authorized labeling does not truly represent the intended uses of the drug.

(b) The submission of a supplemental new-drug application is not required for changes made in the new drug, or in its labeling, or in the manufacturing facilities or controls under which it is produced, that are not significant from the standpoint of the safety of the new drug as established by the original new-drug application. The holder of an effective new-drug application should submit to the New Drug Branch, in writing, full details of any proposed change or changes, and he will be notified in writing whether, in the Food and Drug Administration's opinion, the submission of a supplemental application is required for such change or changes. This includes all mailing and promotional pieces that are to be used after the new drug has been placed on the market.

(c) A supplemental application is not required when the article is no longer a new drug, under the labeling submitted in the new-drug application, unless the proposed change itself causes it to become a new drug.

5. It is proposed to amend § 130.13 to read as follows:

§ 130.13  Insufficient information in application.

The information contained in an application may be insufficient for the New Drug Branch to determine whether a drug is safe for use if it fails to include (among other things) a statement showing whether the drug is to be limited to prescription sale and exempt under section 502(f)(1) of the act, from the requirement that its labeling bear adequate directions for use. If the drug is to be exempt, the information may also be insufficient if:

(a) The specimen labeling proposed for use on or within the package from which the drug is to be dispensed fails to bear adequate information for use, including indications, effects, dosages, routes, methods, and frequency and duration of administration, and any relevant hazards, contraindications, side effects, and precautions under which practitioners licensed by law to administer the drug can use the drug for the purposes for which it is intended, including all purposes for which it is to be advertised or represented.

(b) The application fails to show that the labeling and advertising of the drug will offer the drug for use only under those conditions for which it is offered in the labeling on or within the package from which the drug is to be dispensed.

(c) The application fails to show that all labeling which furnishes or purports to furnish information for use of the drug will contain adequate information for use, including indications, effects, dosages, routes, methods, and frequency and duration of administration, and any relevant hazards, contraindications, side effects, and precautions which is contained in the labeling on or within the package from which the drug is to be dispensed.

Dated: July 18, 1960.

[SEAL]    GEO. P. LARRICK,  
*Commissioner of Food and Drugs.*

[F.R. Doc. 60-6857; Filed, July 21, 1960; 8:48 a.m.]

[ 21 CFR Part 120 ]

SULFUR DIOXIDE AND SODIUM METABISULFITE USED IN FUMIGATION OF STORED GRAINS

Notice of Proposal To Exempt From Requirement of Tolerances

Data in possession of the Food and Drug Administration indicate that the pesticide chemical sulfur dioxide has been used in the fumigation of stored grains to combat insect infestation, to combat deterioration caused by fungi, and to serve as a warning indicator of less odoriferous fumigants used with it. The sulfur dioxide may be used directly as a gas in combination with other fumigants or it may be released from sodium metabisulfite. When sulfur dioxide is used in the fumigation of grains, it has no adverse affect on thiamine of cereal grains and it does not constitute a hazard to the public health.

Accordingly, the Commissioner of Food and Drugs, on his own initiative and under the authority of the Federal Food, Drug, and Cosmetic Act (sec. 408 (e), 68 Stat. 514; 21 U.S.C. 346a(e)), vested in the Secretary of Health, Education, and Welfare and delegated to the Commissioner (25 F.R. 5611), proposes that the regulations for tolerances for pesticide chemicals in or on raw agricultural commodities (21 CFR Part 120) be amended by adding the following new section:

§ 120.180  Exemption from the requirement of a tolerance for residues of sulfur dioxide from direct application or from sodium metabisulfite.

Sulfur dioxide from direct application or from sodium metabisulfite is exempted from the requirement of a tolerance for residues, when used in the fumigation of barley, buckwheat, corn, oats, popcorn, rice, rye, sorghum (milo), wheat.

A person who has registered or who has submitted an application for the registration of an economic poison under the Federal Insecticide, Fungicide, and Rodenticide Act containing sulfur dioxide or sodium metabisulfite may request, within 30 days from the date of publication of this proposal in the FEDERAL REGISTER, that the proposal be referred to an advisory committee in accordance with

6988

PROPOSED RULE MAKING

section 408(e) of the Federal Food, Drug, and Cosmetic Act.

Any interested person is invited at any time prior to the thirtieth day from the date of publication of this notice in the FEDERAL REGISTER to file with the Hearing Clerk, Department of Health, Education, and Welfare, Room 5440, 330 Independence Avenue SW., Washington 25, D.C., written comments on the proposal. Comments may be accompanied by a memorandum or brief in support thereof. All documents shall be filed in quintuplicate.

Dated: July 18, 1960.

[SEAL]  GEO. P. LARRICK,
*Commissioner of Food and Drugs.*

[F.R. Doc. 60-6856; Filed, July 21, 1960; 8:48 a.m.]

# FEDERAL AVIATION AGENCY

[ 14 CFR Part 507 ]

[Reg. Docket No. 450]

## AIRWORTHINESS DIRECTIVES

### Boeing 707-100 Series Aircraft

Pursuant to the authority delegated to me by the Administrator, (§ 405.27, 24 F.R. 2196), notice is hereby given that the Federal Aviation Agency has under consideration a proposal to amend Part 507 of the regulations of the Administrator to include an airworthiness directive requiring modifications to Boeing 707-100 Series aircraft engine start levers. This proposal requires an additional start lever detent modification to prevent the lever slipping to the "off" position thereby cutting off the fuel supply, and provides a more adequate engine ignition circuitry modification.

Interested persons may participate in the making of the proposed rule by submitting such written data, views or arguments as they may desire. Communications should be submitted in duplicate to the Docket Section of the Federal Aviation Agency, Room B-316, 1711 New York Avenue NW., Washington 25, D.C. All communications received on or before August 23, 1960, will be considered by the Administrator before taking action on the proposed rule. The proposals contained in this notice may be changed in light of comments received. All comments submitted will be available, in the Docket Section, for examination by interested persons when the prescribed date for return of comments has expired. This proposal will not be given further distribution as a draft release.

This amendment is proposed under the authority of sections 313(a), 601 and 603 of the Federal Aviation Act of 1958 (72 Stat. 752, 775, 776; 49 U.S.C. 1354(a), 1421, 1423).

In consideration of the foregoing, it is proposed to amend § 507.10(a), (14 CFR Part 507), by adding the following airworthiness directive:

BOEING. Applies to the following 707-100 Series aircraft:
Serial Numbers 17586 through 17591, 17628 through 17651, 17658 through 17672, 17696 through 17702, and 17925 through 17927.
Compliance required by 90 days after publication in the FEDERAL REGISTER as an adopted rule.

Incidents have occurred of the engine start lever slipping to the "OFF" position causing engine flame-out. One such incident occurred during take-off. These incidents were caused by insecure placement of the start lever in the "idle" position. In addition, inspections have disclosed the presence of incorrect parts and improper installations on some airplanes.

Also, in the present starting ignition system, on some airplanes, the igniter plug fires during initial engine rotation. This has caused combustion chamber explosions when fuel vapors were present.

To correct the above unsatisfactory conditions, the following modifications and inspections are required:

I. Modify and inspect the start lever system as follows:
a. Machine an additional slot at the start position of the start lever latch in each of the start lever guides as shown in Fig. 1 of Boeing Service Bulletin 369 dated April 15, 1959.
b. Ascertain that the control stand start lever spacers, P/N 66-19067-1 and -2, and lever guide fillers P/N 66-9256-3, are correctly installed as follows:
(1) The two outboard spacers must be P/N 66-19067-1 and -2 and installed in accordance with Boeing Drawing 66-1795. (Boeing 707 Parts Catalog Fig. 25-2-11 is in error in calling for P/N 66-9256-1 and -2 for Items 28 and 33. Correct P/N's are 19067-1 and -2 as indicated above.)
(2) The middle lever guide filler, P/N 66-9256-3, must be installed with the wide section at the top and not at the bottom. (Item 17 in Fig. 75-2-11 of Boeing 707 Parts Catalog is incorrect in that it shows the wide section at the bottom.)
c. Ascertain that the start lever detents have a minimum distance of .53 inches between the stop strap and the idle detents in accordance with Bulletin 369.
d. After reinstallation of the start levers, ascertain that the start lever system is properly rigged as covered in Chapter 76 of Boeing 707-100 Series Maintenance Manual. This applies only to airplanes which require removal of the start lever detents for machining the slot.

II. Modify the starting ignition system as follows:
a. Remove the jumper wire between the "COMMON" terminal and "NO" terminal of each engine start lever switch (S192, S193, S194, S195).
b. Install a wire from the "ON" contact flight start and control switches (S188, S189, S190 and S191) on the pilot's overhead panel to the corresponding engine ignition circuit breaker bus on the P6 circuit breaker panel. Remove the No. 18 jumper wire between the flight start and ground start terminals of the engine start and control switch. Boeing Service Bulletin No. 195 (R-1) dated July 8, 1959, and Supplement No. 195 (R-1) A dated August 4, 1959, covers these changes.

Issued in Washington, D.C., on July 15, 1960.

B. PUTNAM,
*Acting Director, Bureau of Flight Standards.*

[F.R. Doc. 60-6822; Filed, July 21, 1960; 8:45 a.m.]

[ 14 CFR Part 608 ]

[Airspace Docket No. 60-NY-29]

## RESTRICTED AREAS

### Modification of Restricted Area/Military Climb Corridor

Pursuant to the authority delegated to me by the Administrator (§ 409.13, 24 F.R. 3499), notice is hereby given that the Federal Aviation Agency is considering an amendment to § 608.40 of the regulations of the Administrator, the substance of which is stated below.

The Federal Aviation Agency has under consideration a proposal by the Department of the Air Force for modification of the Rome, N.Y., Restricted Area/Military Climb Corridor (R-544). The present climb corridor extends from a point 5 statute miles from the airbase on the 138° and 318° True radials of the Griffiss TVOR, to a point 32 statute miles northwest. The lower altitude limits extend in graduated steps from 2,500 feet MSL to 19,500 feet MSL. It is proposed to modify the lateral dimensions of the climb corridor by designating it on the 138° and 318° True radials of the Griffiss TVOR and the 318° True radial of the Griffiss TACAN, extending from 5 statute miles northwest of the airbase to 32 statute miles northwest of the airbase having a width at the beginning extending from 1 statute mile southwest of the TVOR 138° True radial to 1 statute mile northeast of the TACAN 318° True radial, expanding uniformly to a width extending from 2.3 statute miles southwest of the TVOR 318° True radial to 2.3 statute miles northeast of the TACAN 318° True radial at the outer extremity. This modification would provide protection for TACAN or VOR equipped air defense aircraft while operating within the Restricted Area/Military Climb Corridor.

If this action is taken, the Rome, N.Y., (Griffiss AFB), Restricted Area/Military Climb Corridor (R-544) (Albany Chart) would be designated as follows:

*Description.* That area based on the 138° and the 318° True radials of the Griffiss TVOR and the 318° True radial of the Griffiss TACAN, extending from 5 statute miles northwest of the airbase to 32 statute miles northwest of the airbase, having a width from 1 statute mile southwest of the 138° True radial of the TVOR to 1 statute mile northeast of the 318° True radial of the TACAN at the point of beginning, expanding uniformly to a width of 2.3 statute miles southwest of the 318° True radial of the TVOR to 2.3 statute miles northeast of the 318° True radial of the TACAN at the outer extremity.

*Designated altitudes.*
2,500′ MSL to 15,500′ MSL from 5 statute miles northwest of the airbase to 6 statute miles northwest of the airbase.
2,500′ MSL to 24,500′ MSL from 6 to 7 statute miles northwest of the airbase.
2,500′ MSL to 27,000′ MSL from 7 to 10 statute miles northwest of the airbase.
6,500′ MSL to 27,000′ MSL from 10 to 15 statute miles northwest of the airbase.
10,500′ MSL to 27,000′ MSL from 15 to 20 statute miles northwest of the airbase.