**EXHIBIT 1**

1

1              VOLUME   I

2              PAGES    1 - 237

3              EXHIBITS  Per Index

4

5        UNITED STATES DISTRICT COURT

6           DISTRICT OF MASSACHUSETTS

7   ------------------------------x

8  NANCY A. BOHLIN, INDIVIDUALLY,

9  AND AS MOTHER AND NEXT FRIEND OF

10  SAMANTHA A. BOHLIN, A MINOR,     Civil Action

11     Plaintiff          No. 03-CV-11577

12     v.                 (MEL)

13  ELI LILLY AND COMPANY,

14     Defendant

15  ------------------------------x

16

17       DEPOSITION OF HAROLD B. SPARR

18       Tuesday, December 7, 2004

19          Foley Hoag, LLP

20          155 Seaport Boulevard

21          Boston, Massachusetts

22

23     REPORTER:  Virginia L. Barry, RPR/CSR

24

**Sparr, Harold (12/7/04)                    Page 1**

5

1   Attorney Patricia Stanford?

2      A.  About 11 months.

3          MR. LEVINE:  I think you mean

4   retained, as opposed to employed.  We don't take out

5   taxes.

6          THE WITNESS:  Right.

7      Q.  So Mr. Levine's interjection is that

8   you're an independent contractor employed by him; is

9   that correct?

10     A.  Correct.

11     Q.  And is that your only employment at

12  present, working for these two attorneys?

13     A.  Well, I'm an on call pharmacist at a

14  hospital in Brookline, but I haven't been called in

15  the past year.

16     Q.  I'm going to go back to your employment by

17  these two attorneys in a minute.  Let me go through

18  a little bit about my understanding about your

19  background.  Am I correct, sir, that you attended

20  and graduated from the Massachusetts College of

21  Pharmacy, graduating in 1955?

22     A.  That's correct.

23     Q.  Am I correct also in looking at an exhibit

24  to your report that following that graduation you (2/7/04)          **Page 5**

7

1  where you practiced pharmacy between 1958 and 1969?

2      A.  Yes.

3      Q.  And your resume also indicates that in

4  1970 you were at Robert's Pharmacy in Belmont; is

5  that correct?

6      A.  That's correct, I purchased it.

7      Q.  And you purchased it in 1970?

8      A.  In December, '69.

9      Q.  And after you made that purchase did you

10  practice as a pharmacist at the Robert's Pharmacy in

11  Belmont, Massachusetts?

12      A.  That's correct.

13      Q.  And for 1970 was that the only pharmacy

14  where you practiced pharmacy?

15      A.  Yes.

16      Q.  How long did you stay at the Robert's

17  Pharmacy?

18      A.  Until 1976.

19      Q.  Now, between 1958 and 1971, I'm going to

20  be, I realize that you have experience after that,

21  but between 1958 and 1971 is it accurate to say that

22  your experience as a practicing pharmacist was

23  limited to first the Sparr's Drugstore and then

24  Robert's Pharmacy?         **Sparr, Harold (12/7/04)**                    **Page 7**

8

1      A.  My practice, yes.

2      Q.  Now, looking at your resume, Mr. Sparr, I

3   see that you have obtained a number of honors and

4   positions.  In between 1955, when you graduated from

5   the Mass. College of Pharmacy, and 1971 what, if

6   any, position did you have with the Massachusetts

7   Board of Registration of Pharmacy?

8      A.  None.

9      Q.  And between 1955 and 1971 what, if any,

10   position did you have with the Massachusetts College

11   of Pharmacy and Health Sciences Alumni Association?

12      A.  I was in the alumni association, and I was

13   a member of the Century Club, and on the Board of

14   Corporations.

15      Q.  And the Century Club has to do with

16   contributions; is that correct?

17      A.  Correct.

18      Q.  Mr. Sparr, attached to the report that you

19   gave, which we'll mark as an exhibit in a minute,

20   there is an attachment 10, which is your resume

21   listing of activities, publications, et cetera, and

22   employment, I can put it in front of you, if you

23   like.  But do you know, if, in fact, that Exhibit 10

24   is an accurate statement of your history of **old (12/7/04)**                    **Page 8**

101

1     Q.  Did you make any effort to remind people

2   that they had to think back, and that they couldn't

3   just take their memories from 1972, from the '70s

4   and the '80s and the '90s, and the early part of

5   this century, and apply that back; did you do any --

6     A.  Absolutely not.

7     Q.  So you did nothing to try and help them to

8   focus their memory on the '50s and '60s; is that

9   correct?

10    A.  I asked them if they remembered what brand

11  of diethylstilbestrol they dispensed.

12    Q.  Do I recall, am I correct in my assumption

13  that a pharmacist would not know the purpose for

14  which a doctor wrote a script, the effect that the

15  doctor wanted to have, he would simply know that

16  this drug and strength was prescribed, and to fill

17  it; is that correct?

18    A.  That's correct.

19    Q.  Now, Mr. Sparr, in your report you made

20  mention of The Red Book and The Blue Book; do you

21  remember mentioning that in your report?

22    A.  Yes.

23    Q.  Could you tell us, please, what The Red

24  Book is, please?              **Sparr, Harold (12/7/04)**              **Page 101**

102

1    A.  It's a publication that includes all the

2  different brands of all the drugs that were

3  available with their cost.

4    Q.  And The Red Book, I take it, is called The

5  Drug Topics Red Book; is that correct?

6    A.  Yes.

7    Q.  And this is a publication that went to all

8  pharmacists; is that correct?

9    A.  As far as I know, yes.  We used to receive

10  it every year.

11    Q.  And this list was a list of drugs that

12  were available for purchase by any of those

13  pharmacists; is that correct?

14    A.  That's correct.

15    Q.  So these were drugs that were available in

16  the national supply chain to be purchased; is that

17  correct?

18    A.  That's correct.

19    Q.  And I believe you told me that The Drug

20  Topics Red Book came out every year; is that right?

21    A.  That's correct.

22    Q.  And there was also something called a Blue

23  Book; is that right?

24    A.  That's correct.        **Sparr, Harold (12/7/04)**                **Page 102**

103

1    Q.  And this is called, The American

2  Druggist's Blue Book; is that right?

3    A.  That's right, I'm assuming it is.

4    Q.  Let me show you a photocopy of this.

5    A.  Yes.

6    Q.  The American Druggist's Blue Book?

7    A.  Yes.

8    Q.  And was this also, sir, a publication that

9  went to all pharmacists?

10    A.  Yes.

11    Q.  And this was a publication that listed

12  drugs that were available to purchase on a national

13  basis; is that right?

14    A.  Yes.

15    Q.  So any pharmacist could buy any drug that

16  was listed in The Blue Book or The Red Book; is that

17  correct?

18    A.  Providing that the wholesaler had it.

19    Q.  But these were the ones that were

20  available; is that right?

21    A.  That's correct.  They wouldn't list drugs

22  that weren't available.

23    Q.  Right.

24        MR. LEVINE:  How do you know?**d (12/7/04)**        **Page 103**

104

1    A.  Why would they?

2        MR. LEVINE:  Because they're out of

3  date.

4    Q.  Now --

5        (Phone interruption.)

6    Q.  Now, Mr. Sparr, some pharmacists could

7  purchase drugs directly and not use a wholesaler; is

8  that right?

9    A.  That is correct.

10   Q.  And am I correct that in The Blue Book and

11  Red Book some of these companies listed off phone

12  numbers where they could be reached to purchase

13  drugs without going through a wholesaler?

14   A.  We had catalogues from the various

15  companies that we would buy from, and it would have

16  the phone number in there or the business card of

17  the representative of that company.

18   Q.  Mr. Sparr, is it your understanding that

19  all of the drugs that were available in the country

20  and all the companies that made drugs listed them in

21  The Red Book and The Blue Book?

22   A.  I assume if they wanted to sell it, it

23  would be.

24   Q.  Were there any local companies that listed 2/7/04)          **Page 104**

105

1   drugs that might not decide to list them in a

2   national publication?

3       A.  It's possible.

4       Q.  Were you aware of any such companies?

5       A.  I knew some repackers, but I never bought

6   from them.

7       Q.  What repackers did you know in

8   Massachusetts?

9       A.  I believe there was a company called Alton

10  Products, and Chester Baker, and a gentleman by the

11  name of Argus, A R G U S.

12      Q.  I'll come back to those in a little bit,

13  Mr. Sparr, later on in my outline here.

14          I guess one thing I forgot to say

15  about the American Druggist, American Druggist Blue

16  Book, I take it that that came out every other year;

17  is that correct?

18      A.  I do remember receiving these two books

19  about six months apart, and we would use the later

20  one as far as the price was concerned.

21      Q.  But your pharmacy received them both, both

22  The Red Book and The Blue Book?

23      A.  Yes.

24      Q.  As part of your survey, Mr. Sparr, did you(2/7/04)          **Page 105**

106

1  make any effort to find out how many different

2  companies listed DES or diethylstilbestrol for sale

3  in these national publications, The Red Book or The

4  Blue Book?

5     A.  I had copies of one of the two books.

6     Q.  Yes.  Did you make any effort to find out

7  how many companies listed their DES products for

8  sale on a national basis?

9     A.  I didn't count them.

10    Q.  Was it your impression that there were

11 hundreds of such companies?

12    A.  Probably at least a hundred.

13    Q.  And was it your impression as you reviewed

14 this that those companies would list their products

15 in more than one year, in several years?

16    A.  Yes.

17    Q.  Did you form the view that those companies

18 were listing the products in these national

19 publications because they were, in fact, selling

20 some of those products?

21    A.  I would assume so.

22    Q.  And it wouldn't make sense for them to

23 continue to list it if they weren't selling any; is

24 that correct?            **Sparr, Harold (12/7/04)**            **Page 106**

107

1    A.  That's correct.

2    Q.  When you did your survey, did you factor

3  in at all the fact that there were in your view at

4  least a hundred, and I will represent to you

5  actually several hundred companies, that listed

6  their DES products for sale nationally in The Red

7  Book and The Blue Book?

8    A.  Did I know it?

9    Q.  Did you factor it in at all to your

10  investigation about --

11    A.  Yes, because the survey didn't direct

12  pharmacists to answer in a particular manner.

13    Q.  Okay.  Now, Mr. Sparr, from your

14  experience as a pharmacist and your conversations

15  with others, did you run across any pharmacists that

16  might use, let's take DES, one brand of DES for

17  filling unspecified prescriptions and another brand

18  available in case a doctor did specify?

19    A.  Yes.

20    Q.  And did you run across any of these

21  companies, any of these pharmacists who had a sort

22  of non famous name pharmaceutical company as the

23  brand that they dispensed in the course of dealing

24  and dispensing generic prescriptions?    **Harold (12/7/04)**          **Page 107**

116

1   records about the prescriptions from individuals?

2       A.  Well, it was between me and the trash can.

3       Q.  Let's begin to turn to your personal

4   experience as a basis for this.  This is really in

5   paragraph one of your letter of October 12, 2004,

6   which is deposition Exhibit 1.

7           In what way, Mr. Sparr, did your

8   personal experience as a retail practicing

9   pharmacist bear on your ability to conclude that

10  Lilly, as you conclude, had 94 percent of DES sales

11  in Massachusetts?

12          MR. LEVINE:  Pregnancy sales.

13      A.  It was based on the, both on the surveys

14  and on the statements that I received.

15      Q.  I'm going to do the survey, and we've

16  talked about the statements you received.  But in

17  paragraph one of your letter you talk about your

18  personal experience --

19      A.  Yes.

20      Q.  -- as a retail practicing pharmacist as

21  one of the bases for your opinion.  And I'm asking

22  you, what is it about your experience as a

23  practicing retail pharmacist at the Sparr Drugstore?

24      A.  Sparr's Drugstores and Robert's Pharmacy2/7/04)              **Page 116**

117

1    we only stocked Lilly brand.

2       Q.  So you can tell from that that for the

3    stores that you were the proprietor of, you only

4    stocked Lilly; is that correct?

5       A.  That's correct.

6       Q.  But from that experience at Sparr's and at

7    Robert's, you would not be able to tell anything

8    else about what any other store did; isn't that

9    right?

10      A.  Except from the statements that I received

11   from pharmacists that practiced in the '50s and

12   '60s.

13      Q.  So your personal experience as a retail

14   practicing pharmacist really gives your experience

15   at Sparr's Drugstore and at Robert's Pharmacy; is

16   that right?

17      A.  Correct.

18      Q.  Let me ask about being a teacher of

19   pharmacy over the past 49 years.  First of all, in

20   what sense were you a teacher of pharmacy over the

21   last 49 years?

22      A.  I was a preceptor for over 650 last year

23   pharmacy students from Mass. College of Pharmacy and

24   Northeastern.                    **Sparr, Harold (12/7/04)**                **Page 117**

118

1    Q.  And what does being a preceptor mean?

2    A.  They had to do a five-week externship in a

3    hospital pharmacy, so the schools would send me

4    students on a regular basis.

5    Q.  So this would be while you were working at

6    the hospital pharmacies that we talked about after

7    the '70s; is that right?

8    A.  Correct.

9    Q.  So in that context, you were not involved

10   in seeing or dispensing prescriptions for DES for

11   the use in accidents of pregnancy; isn't that right?

12   A.  Pardon me?

13   Q.  In the hospital pharmacy context after the

14   1970s you would not have been involved in seeing or

15   filling any prescriptions for DES for the use in

16   accidents of pregnancy?

17   A.  That is correct.

18   Q.  Now, you mentioned being a preceptor for

19   students while you were working in the hospital

20   pharmacies.  Is there any other aspect of teaching

21   pharmacy that you want to call my attention to as a

22   basis for your opinions in this case?

23   A.  I worked for about five semesters as an

24   adjunct professor in the pharmacy practice lab at **2/7/04)**            **Page 118**

119

1  Mass. College of Pharmacy.

2     Q.  And about when was this, please?

3     A.  '90, '91, '92.

4     Q.  And, I take it, then, that at that period

5  of time in the '90s nothing about your teaching

6  would have had anything to do with seeing or filling

7  prescriptions for DES in relation to accidents of

8  pregnancy?

9     A.  That's correct.

10        MR. LEVINE:  You're entirely ignoring

11  the historical aspect of these positions.

12        MR. DILLON:  I'm just asking the

13  questions.

14        MR. LEVINE:  Okay, but you're asking

15  the wrong questions.  I get to ask the questions

16  when I'm qualifying him, and I will be able to show

17  that in this preceptorship and in the adjunct

18  professor he did come into contact with the

19  historical aspects of pharmacy and DES, but you

20  don't want to do it, it's your deposition.

21        MR. DILLON:  I think that that's

22  something that I'll let you worry about.

23        MR. LEVINE:  Okay.

24     Q.  Is there anything else that you want to  **(12/7/04)**        **Page 119**

126

1     A.  Correct.

2     Q.  So in terms of designing a survey, I take

3   it that you had never before attempted or been

4   involved in designing a survey to develop market

5   share; is that right?

6     A.  No.

7     Q.  Am I incorrect, you have been involved in

8   designing a survey?

9     A.  No, I have not, I was not.

10     Q.  I take it that you haven't done any

11   publications on survey research; is that correct?

12     A.  That's correct.

13     Q.  And have you ever taken any course work in

14   survey design?

15     A.  No.

16     Q.  Have you ever taken any, received any

17   training in psychology?

18     A.  I believe I took a psychology class when I

19   was at Mass. College of Pharmacy.

20     Q.  Were you ever involved in a class involved

21   in psychology or sociology related to survey

22   research?

23     A.  No.

24     Q.  How about marketing, have you ever taken/7/04)          **Page 126**

127

1  any, ever received any training in marketing?

2      A.  I went to Babson when I was working

3  towards an MBA degree, I went there for

4  three semesters, and several of the courses that I

5  took were in marketing.

6      Q.  And I take it you did not decide to

7  complete that degree at Babson; is that right?

8      A.  That's right, it interfered with my work

9  schedule.

10     Q.  Have you had any formal training in

11 statistics?

12     A.  No.  I started a statistic course at

13 Babson, but that's when I dropped out.

14     Q.  Before you got involved in this project

15 did you have any experience in sampling; in other

16 words, in deciding what sample out of a larger group

17 would accurately reflect the findings that you would

18 get in the larger group?

19     A.  Yes.

20     Q.  And in what way did you do that?

21     A.  In the survey I, we decided what year that

22 we were going to determine to be the midline of

23 popularity.

24     Q.  Okay.  I really wanted to ask, I did not **(12/7/04)**          **Page 127**

128

1    ask the question clearly, before you got involved in

2    this survey for Mr. Levine had you ever been

3    involved in attempting to design a sampling

4    methodology?

5        A.  No.

6        Q.  Okay.  Now, you mentioned about sampling

7    in this one that you would attempt to define a

8    midpoint, as it were, for popularity; is that what

9    you tried to do?

10       A.  Yes.

11       Q.  And what did you determine the mid point

12   was?

13       A.  I looked at the matrixes of California and

14   New York.

15       Q.  And the matrixes, each of them give the

16   market share, as it were, for each of the companies

17   involved in those proceedings; is that correct?

18       A.  Yes.

19       Q.  And how did you use the matrices to decide

20   where the peak of demand was or peak of use?

21       A.  Well, I personally remembered it from

22   dispensing when it started to decline and when it

23   became really popular.

24       Q.  And what did you remember about -- so the **(7/04)**        **Page 128**

141

1        MR. LEVINE: But was it a nurse?

2        THE WITNESS: I don't know.

3    Q.  Whatever it was, this list of 370 is a

4  list that you got from Mr. Levine's office; is that

5  correct?

6    A.  Correct.

7    Q.  And what, if anything, did you do to find

8  out if that, in fact, represented the list, what it

9  said to be, those who got a license during those

10  years, '63 to '67, for the first time and were still

11  practicing in Massachusetts; what did you do to test

12  that?

13    A.  Well, I recognized the fact that the

14  licensees, I was able to go to the alumni directory

15  and look in there by year, and I saw the names, the

16  names popped up from Mass. College of Pharmacy, but

17  there were other schools of pharmacy where people

18  became registered.

19    Q.  What did you do to find out that the list

20  of names you got from Mr. Levine accurately

21  reflected that category of people who were first

22  licensed between 1963 and 1967 and who were also

23  still practicing in Massachusetts?

24    A.  I would see absolutely no reason why they 2/7/04)        **Page 141**

142

1  would lie.

2      Q.  So you didn't do -- you didn't see the

3  need to do anything to test them?

4      A.  No.

5      Q.  So you were not actually trying to find

6  out about pharmacists who were simply licensed

7  between 1963 and 1967, you also had this additional

8  condition that to qualify for this study they had to

9  also still be practicing; is that right?

10     A.  That's correct, because the disk only has

11 those currently licensed.

12     Q.  So there were a number of pharmacists, I

13 take it -- so, I'm sorry, the disk only has those

14 currently licensed?

15     A.  That's correct.

16     Q.  I see.  So there were pharmacists who

17 were, in fact, licensed between 1963 and 1967 who

18 either stopped the practice of pharmacy or moved

19 somewhere else, but wouldn't show up in your group;

20 is that right?

21     A.  That's correct.

22     Q.  And how many were those?

23     A.  I have no idea.

24     Q.  Who was it who felt that this category --**12/7/04)**        **Page 142**

143

1   let me back up.  Who was it who decided that this

2   category of pharmacists who were first licensed in

3   1963 to 1967 and were still current was a group that

4   was an adequate sampling frame or survey population

5   for your study, who did that?

6       A.  I determined it.

7       Q.  You determined that?

8       A.  Yes.

9       Q.  And what were the criteria that you used

10  to determine that?

11      A.  I knew the popularity of the drug peaked

12  in 1965, around 1965, so I went back two years

13  before '65 to two years after '65.

14      Q.  And that is the only criteria you had; is

15  that correct?

16      A.  Yes.

17      Q.  Did you have any basis to decide that the

18  people that were still practicing accurately

19  reflected that cadre of pharmacists who were first

20  licensed between 1963 and 1967?

21      A.  It was a representation.

22      Q.  How do you know that?

23      A.  Because I do know some of them that are

24  still working.                    **Sparr, Harold (12/7/04)**                    **Page 143**

144

1    Q. So --

2    A. They're younger than I am.

3    Q. What was the basis on which you decided

4    that this was a, you know, an adequate snapshot, an

5    accurate snapshot of what that group of newly

6    licensed pharmacists between '63 and '67 looked

7    like; how did you decide that?

8    A. I decided that the peak period was 1965,

9    and I went two years on either side of that.

10    Q. I understand that part, but now you've got

11    this extra thing, which is a dividing line that

12    you're now not dealing with everybody whose been

13    licensed between '63 and '67, but only that part of

14    that group that's still practicing in 2004.

15    A. Correct.

16    Q. All right. How did you decide that those

17    who still were practicing in 2004, whatever that

18    group was, was representative of the group that was

19    first licensed in '63 and '67; how did you decide

20    that?

21    A. Well, I felt that because they were still

22    licensed, that the majority of them were still

23    working, and they would have good knowledge of what

24    transpired back in the '60s. **Sparr, Harold (12/7/04)**          **Page 144**

156

1      A.  My personal experience I know.

2      Q.  Okay.  I don't want your personal

3   experience to interfere with this question.  I

4   understand you have personal experience, and I

5   understand that you have other surveys and

6   interviews that you've done besides the survey.  But

7   with respect to the survey we've been talking about,

8   where the first entrant, okay, was licensed on

9   January 1, 1963, do you agree with me that that

10  survey standing alone, that survey alone cannot

11  supply you with any information about practices in

12  Massachusetts before January 1, 1963?

13     A.  It only gives me information from '63 to

14  '67.

15     Q.  Okay, thank you.  That's really all I

16  wanted.  Now, Mr. Sparr, if we take your assumption

17  that there were, approximately, between 4500 and

18  5000 pharmacists practicing in Massachusetts between

19  1963 and 1967, 370 is a pretty small percentage of

20  that; isn't it?

21     A.  You have to consider that pharmacists in

22  order to get licensed have to have 1500 hours of

23  explorational training, and they get that, they

24  usually start working in their first year at **rold (12/7/04)**                    **Page 156**

157

1 pharmacy school in a pharmacy, that's a requirement,

2 so they would know what went on prior to 1963.

3 Those people that got registered, licensed in 1963,

4 they would have known since '59.

5     Q. Okay. Now, Mr. Sparr, when you're a

6 student at the college --

7         MR. LEVINE: You're arguing with him

8 now.

9     Q. When you're a student at the College of

10 Pharmacy, Mr. Sparr, are you allowed to fill

11 prescriptions?

12     A. Yes.

13     Q. You can fill prescriptions from the first

14 year?

15     A. Yes.

16     Q. And are you allowed to purchase

17 prescriptions and buy them, order them?

18     A. Yes.

19     Q. And has that happened in your store, at

20 the Sparr Drugstore, did you let students from the

21 pharmacy school fill prescriptions in your store?

22     A. I was the only student. I didn't dispense

23 it, I filled it; there's a difference.

24     Q. I see. I'm sorry. So dispensing the old (12/7/04)                    **Page 157**

159

1  made, and I'll come back to it, because I don't

2  think we're going to get done here.

3      MR. LEVINE:  On that respect let me

4  say that you do not have an unlimited amount of

5  time.  Now, six hours, I think, is plenty.

6      MR. DILLON:  Well, I'm on page --

7      MR. LEVINE:  You've got two hours.

8      MR. DILLON:  Mr. Levine, I'm going to

9  take the deposition that I'm going to take, and I

10  have a rather lengthy outline.  I have a lot of

11  questions to ask Mr. Sparr.

12      MR. LEVINE:  Now that you're paying

13  Mr. Sparr, and as soon as he provides you with his

14  rates for his testimony, you can go forward.

15      Q.  Mr. Sparr, let me go back to your

16  statement, which is Exhibit 1 to the deposition, and

17  Exhibit 4 to that is this letter of May 5th, 2004,

18  to you, from Mr. Levine.

19      A.  From me, to Mr. Levine?

20      Q.  No, from Mr. Levine, to you, May 5th.

21      A.  Correct.

22      Q.  Now, Mr. Sparr, in the second paragraph

23  there, this letter talks about the trustworthiness

24  of the survey depending on a well grounded sampling04)

**Page 159**

160

1  and minimization of hearsay dangers; in your study

2  what did you do to minimize hearsay dangers?

3      A.  There's absolutely no mention --

4          MR. LEVINE:  It's not only his study,

5  but it's a study of three people.  It's not his

6  study.  The primary statistical brains behind it was

7  Doctor Vanderschmidt.  But go ahead.

8      Q.  Okay.  Well, you mentioned three people,

9  it's Doctor Vanderschmidt, Mr. Sparr, and

10  Mr. Levine; is that right?

11      A.  Mr. Steer.

12      Q.  Okay.  What, if anything, did you do to

13  minimize the hearsay dangers?

14      A.  Made sure that there weren't anything in

15  the questions that would lead them to answer it

16  incorrectly.

17      Q.  And what was it about the questions that

18  you put in there to avoid hearsay problems?

19      A.  They weren't leading questions.

20      Q.  Is there anything in this survey that you

21  did that would make sure that the pharmacist was

22  answering from their own personal experience, as

23  opposed to information that they may have gotten

24  from somebody else?       **Sparr, Harold (12/7/04)**              **Page 160**

161

1    A.  I didn't go to each one of their houses to

2  see if they filled it out without asking anybody

3  else.  I assumed they did it by themselves.  It's

4  really not a very tough questionnaire.

5    Q.  The next thing in that paragraph is about

6  protecting against the relative susceptibility of

7  the faulty memory.  Now, what, if anything, did you

8  do to guard against susceptibility of faulty memory?

9    A.  If they couldn't remember, they couldn't

10  fill it out.

11    Q.  Is there any other aspect of memory, I

12  think we talked about this before, about people who

13  have memories that, in fact, don't correspond to the

14  actual fact, is there anything you did to try and

15  find out if any of the respondents to this survey

16  had a flaw in their memory or were incorrect?

17    A.  No.

18    Q.  Why don't you tell me everything you can

19  tell me about the universe that you defined as

20  listed on there, on Mr. Levine's letter to you and

21  request, there is importance to have a properly

22  defined universe, and is there anything about the

23  universe that you wanted to define for me that you

24  haven't told me before?    **Sparr, Harold (12/7/04)**              **Page 161**

162

1      A.  Well, in my travels for the National

2   Association of Boards of Pharmacy I have spoken to

3   pharmacists from East Coast to West Coast, from

4   north to south, and it all comes out the same.

5      Q.  Do you understand what Mr. Levine was

6   talking about in this letter of May 5th when he

7   talked about, "a properly defined universe"?  Well,

8   let me ask a different question, what do you

9   understand by the term, "a properly defined

10   universe"?

11      A.  I take it to understand that within the

12   confines of the United States the practice of

13   pharmacy was the same in all 48 states.

14      Q.  And that is your assumption; is that

15   correct?

16      A.  That's correct, that's my opinion.

17      Q.  Now, a representative sampling of that

18   universe, is there anything about the reasons why

19   you chose the sample that you did that you want to

20   tell me besides what you've said?  I mean, what

21   you've told me so far, to sum it up --

22      A.  No.

23      Q.  To sum it up to be clear, though, we're on

24   the right same page, you thought that the peak **(12/7/04)**          **Page 162**

163

1    period was, approximately, 1965 in terms of use of

2    the drug, and that you chose '63 to '67 to try and

3    go around that perception of peak use, and that's

4    what you did; is there anything else you want to

5    tell me about sampling besides that?

6        A.  No.

7        Q.  Now, were any of the people who appeared

8    on this list of 370 or so, were any of those people

9    who you had previously spoken to and gotten a

10   statement from?

11       A.  I don't know, because I didn't see the

12   labels.  I didn't see who it was until after they

13   returned them.

14       Q.  Okay.  So do I take it, then, that you

15   never saw the list of 370 people who were mailed

16   this?

17       A.  That's correct.

18       Q.  I was going to ask, because I believe on

19   your report it says something about the list

20   attached, and I don't see a list within your report,

21   Exhibit 1 to this deposition, which tells me the 370

22   people who got this?

23       A.  No, these are the people that replied.

24       Q.  Do you have the list of the 370 people who/**7/04**)                    **Page 163**

183

1    Q.  And they sold DES; didn't they?

2    A.  I really don't know.  I never bought from

3  them.

4    Q.  Did you ever hear of a man named David

5  Meyers of a pharmacy called Trackenberg and Meyers?

6    A.  Yes, I knew them.

7    Q.  Were you aware that his deposition was

8  taken in a case here in Massachusetts?

9    A.  No.

10   Q.  If Mr. Meyers said at his deposition that

11  they carried Berkeley DES, and if they had a

12  specification for Lilly, they would go get that,

13  would that fit with your image of practice in

14  Massachusetts or conflict with it?

15   A.  Conflict with it.

16   Q.  Do you think he was wrong about what he

17  did in his own store?

18   A.  That was his business.  I can't tell him

19  what to do.

20   Q.  Are you familiar with the Melvin Pharmacy

21  in Brighton, Massachusetts?

22   A.  Yes.

23   Q.  Do you know that the Melvin Pharmacy also

24  carried Berkeley Drug DES?  **Sparr, Harold (12/7/04)**          **Page 183**

184

1   A.  No.

2       MR. LEVINE:  I'm sorry, carried who?

3       MR. DILLON:  Berkeley.

4   Q.  If you were to see information that

5   demonstrated to you that the Melvin Pharmacy in

6   Brighton did carry Berkeley, would that change any

7   of your views about the distribution of companies?

8   A.  Absolutely not.

9   Q.  You mentioned Argus, Argus Drug; do you

10  know if Argus Drug sold DES?

11  A.  I have no idea.

12  Q.  If --

13  A.  I wouldn't sell it.

14  Q.  If I told you that Argus Drug DES was used

15  at the Samoset Pharmacy in Quincy, would that,

16  assuming, I'm going to ask you to assume it's true,

17  if you assume that was true, would that change any

18  of your views about distribution?

19  A.  Absolutely not.

20  Q.  If I told you that Argus Drug was used at

21  the Clover Drug at Milton, Massachusetts, would that

22  change any of your views today?

23  A.  Absolutely not.

24  Q.  If you I told you that Argus Drugs was **(12/7/04)**          **Page 184**

185

1   used at the Ogar Pharmacy in Dorchester --

2          MR. LEVINE:  Are you going to give us

3   years or dosages or not?

4     Q.  I'm going to give you DES at Argus Drug

5   Company.  Argus at the Ogar Pharmacy, but if I asked

6   you to accept for a moment and assume that, in fact,

7   there is evidence that Argus' DES was at the Ogar

8   Pharmacy and asked you to assume that, would that

9   change any of your views about this?

10    A.  Absolutely not.

11    Q.  How about Brewer Pharmaceutical Company,

12   did you ever hear of them?

13    A.  Yes.

14    Q.  Did they make DES?

15    A.  I know they packaged it.

16    Q.  And they were based in Worcester,

17   Massachusetts; isn't that right?

18    A.  Correct.

19    Q.  So you think it's likely that pharmacies

20   around Worcester, Massachusetts, would have used

21   Brewer DES?

22    A.  No.

23    Q.  Why not?

24    A.  Because Lilly was the standard.  I don't **(12/7/04)**          **Page 185**

186

1   know where Brewer sold their DES.

2       Q.  Well, if I told that we could find Brewer

3   DES in Jones Pharmacy in Natick, and I asked you to

4   accept that, would that fact have any bearing on

5   your view about the distribution of companies in

6   Massachusetts?

7       A.  No.

8       Q.  How about Columbia Pharmacal, you ever

9   hear of them?

10      A.  No.

11      Q.  If I told you that the Columbia Pharmacal

12  was at the Clover Drug at Milton and asked you to

13  assume that as a fact, would that fact have any

14  bearing on your view about the distribution of

15  company DES in Massachusetts?

16      A.  No.

17      Q.  You mentioned Chester Baker when we were

18  talking before, do you remember you mentioned

19  Chester Baker?

20      A.  Yes.

21      Q.  They were a local company selling

22  pharmaceuticals; isn't that right?

23      A.  Yes.

24      Q.  And they made DES; didn't they?**rold (12/7/04)**          **Page 186**

187

1      A.  I don't believe they made it.  They

2  probably repackaged.

3      Q.  They sold DES?

4      A.  Whatever.

5      Q.  Did they sell any DES in Massachusetts?

6      A.  I have no idea.

7      Q.  They were a Massachusetts company; weren't

8  they?

9      A.  True.

10     Q.  So don't you think it's likely that they

11  had distribution in Massachusetts?

12     A.  They might have.

13     Q.  And if I told you that Chester Baker DES

14  was found in Johnson's Pharmacy in Cochituate,

15  Massachusetts, and asked you to assume that for a

16  fact, would that have any bearing on your view about

17  the distribution?

18     A.  None whatsoever.

19     Q.  If I told you that it was found in

20  Billings & Stover Pharmacy in Cambridge,

21  Massachusetts, would that have any bearing at all on

22  your view of it?

23     A.  No.

24         THE REPORTER:  I'm sorry, you have to/7/04)          **Page 187**

188

1   let him finish.  It's getting late, and I can't take

2   the end when you're talking.  So I would like to ask

3   you to repeat it.

4           (Record read as requested.)

5      Q.  Billings & Stover Pharmacy at Cambridge,

6   Massachusetts, Chester Baker DES?

7           MR. LEVINE:  Where are you going with

8   all this?  He admits that there's a small percentage

9   of other companies, it's in his report.

10     A.  No.

11          MR. DILLON:  I'm --

12     Q.  Well, Mr. Sparr, you answered "no" to the

13  question I asked; is that right?

14     A.  Correct.

15     Q.  Mr. Sparr, what account at all did you

16  take of, say, the Chester Baker sale, a local

17  company, or the Argus sales, which is a local

18  company, or the Brewer sales, which is a local

19  company, what account did you take in your view when

20  you ascribed market share as to different companies

21  in Massachusetts?

22     A.  My view was that in those years I

23  personally did not trust generics, and I know that

24  was the view of many of the pharmacists that I knew/(04)                **Page 188**

189

1      Q.  The fact that these companies exist do

2    suggest that some pharmacists trusted their

3    products; doesn't it?

4      A.  That may be.

5      Q.  How about CD Smith?

6      A.  Never heard of it.

7      Q.  Never heard of CD Smith?

8      A.  No.

9      Q.  You don't know if they made DES, then?

10     A.  No.

11     Q.  And you don't know if they sold it to the

12   Rosemont Pharmacy in Brighton, Massachusetts?

13     A.  No.

14     Q.  How about Supreme Pharmacy?

15     A.  I've heard of it.

16     Q.  And assume that they made DES, and that it

17   was found in the Wellesley Pharmacy in Wellesley,

18   Massachusetts, would that fact added to the other

19   facts that I've told you have any bearing on your

20   views?

21     A.  No.

22     Q.  If I told that you that Supreme was also

23   found at the Clover Drugstore in Milton, which had

24   Columbia Pharmacal, as well, if I told you that, and7/04)          **Page 189**

190

1    asked you to assume that to be true, would that have

2    any bearing on your opinions?

3        A.  No.

4        Q.  How about Waban Pharmacal?

5        A.  Never heard of it.

6        Q.  Well, do you know -- you've never heard of

7    it, I take it you don't know that they made any DES;

8    is that right?

9        A.  No.

10       Q.  So you have no room for them in your

11   calculation about your market share?

12       A.  No.

13       Q.  Another thing you said, I'm trying to move

14   through this quickly, you said in your statement,

15   which is Exhibit 1, if you'd look in your statement,

16   you said some things about the rejected Lilly's view

17   of market share?

18       A.  The what?

19       Q.  Rejected Lilly's view of market share; I

20   believe it's on page 5 of your letter?

21       A.  What are you referring to?

22       Q.  I'm referring to the middle paragraph

23   there.  You're reviewed the expected testimony, all

24   right?                    **Sparr, Harold (12/7/04)**              **Page 190**

236

1        C E R T I F I C A T E

2            I, HAROLD B. SPARR, do hereby

3    certify that I have read the foregoing transcript of

4    my testimony, and further certify that said

5    transcript is a true and accurate record of said

6    testimony (with the exception of the following

7    corrections listed below):

8    Page  Line        Corrections

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19

20   Signed under the pains and penalties of perjury this

21   _____ day of _____, 2004.

22            _____

23            HAROLD B. SPARR

24                **Sparr, Harold (12/7/04)**            **Page 236**

237

```
1            CERTIFICATE

2

3   Commonwealth of Massachusetts

4   Suffolk, ss

5

6      I, Virginia L. Barry, a Notary Public in and

7   for the Commonwealth of Massachusetts, do hereby

8   certify:

9      That HAROLD B. SPARR, the witness whose

10  deposition is hereinbefore set forth, has been

11  satisfactorily identified and duly sworn by me, and

12  that the deposition is a true record of the

13  testimony given by the witness to the best of my

14  skill and ability.

15     IN WITNESS WHEREOF, I have hereunto set my hand

16  this 20th day of December, 2004.

17

18      _____

19      VIRGINIA L. BARRY

20      RPR/CSR#101193

21

22

23  My Commission Expires:

24  June 20, 2008        Sparr, Harold (12/7/04)                Page 237
```